# UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW JERSEY
M.L. KING, JR. FEDERAL BUILDING
50 WALNUT ST., 3RD FLOOR
NEWARK, NEW JERSEY 07102

MORRIS STERN
BANKRUPTCY JUDGE

Phone: (973) 645-4693
Fax:     (973) 645-2606

<u>**NOT FOR PUBLICATION**</u>

January 3, 2011

**FILED**

JAMES J. WALDRON, CLERK

**January 3, 2011**

U.S. BANKRUPTCY COURT
NEWARK, N.J.

BY: <u>s/ Margaret Cohen,</u>
DEPUTY

<u>**LETTER OPINION**</u>
<u>**ORIGINAL FILED WITH THE CLERK OF THE COURT**</u>

Saracino and Saracino, LLC
William Saracino, Esq.
500 Union Boulevard
Totowa, NJ 07512

Kridel Law Group
Geoffrey Orlandi, Esq.
1035 Route 46 East Suite B-204
Clifton, NJ 07013

Re:    Giuseppe Giudice and Teresa Giudice
       Case No.  09-39032 MS
       Mastropole v. Giudice
       <u>Adv. Pro. No.  10-1116 MS</u>

Dear Counsel:

Mr. Saracino and his associates appeared on behalf of plaintiff Joseph Mastropole at trial

of the referenced adversary proceeding on November 19, December 14 and December 15, 2010.

Mr. Orlandi appeared at the trial on behalf of defendants Giuseppe and Teresa Giudice.  The

<u>**NOT FOR PUBLICATION**</u>
**LETTER OPINION**

Page 2
January 3, 2011

court, after closing the record, has considered testimony, exhibits, and argument of counsel in

reaching the following decision.

*   *   *   *

Mastropole and Giuseppe (Joseph) Giudice were associated in a number of real estate

ownership, development, and sale ventures.  When their friendship and business association

came to an end, there was a certain amount of litigation and a settlement of their business

parting.  Mastropole had had $586,000 in mortgages covering three properties held by LLCs

which included Giudice as a member and Mastropole as either a member or some business

affiliate thereof.  (The record is not clear in this regard.)

Events relating to the discharge of a mortgage as to one property during the course of

effectuating the Mastropole-Giudice settlement of affairs has generated Mastropole's claim *sub

judice.*  He maintains that a $260,000 debt due him by both Joseph Giudice and his wife Teresa

Giudice should be excepted from the discharge that could arise from their currently pending

Chapter 7 bankruptcy case.  The complaint for exception to discharge is based upon 11 U.S.C.

§ 523(a)(2)(A) (fraud), § 523(a)(2)(B) (fraud with regard to a written financial statement),

§ 523(a)(4) (embezzlement or fiduciary breach), and § 523(a)(6) (willful and malicious injury to

property).  This court has jurisdiction to hear and decide the issues presented  pursuant to

28 U.S.C. § 1334(b), this District's Order of Reference dated July 23, 1984 and 28 U.S.C.

§ 157(b)(2)(I).

**NOT FOR PUBLICATION**
**LETTER OPINION**

Page 3
January 3, 2011

The court finds that the Mastropole debt is to be excepted from any discharge which J.

Giudice obtains in his Chapter 7 case, based upon § 523(a)(2)(A) and (a)(6). No exception to

discharge applies to T. Giudice.

A time line and description of events significant to this adversary proceeding is as

follows:

<u>May 16, 2006</u> (Mastropole receives mortgages, each in the face amount of
$586,000, encumbering three East Orange, NJ multifamily rental properties
owned by LLCs in which J. Giudice was a member, to wit: 17 Webster Place, 6
Glenwood Avenue, and 168-170 South Clinton Street.)[1]

<u>June 13, 2007</u> (filing of Settlement Agreement purporting to resolve
litigation between the Giudices as plaintiffs and Mastropole and another
defendant, pursuant to which Mastropole was to release his mortgage lien on 168-
170 South Clinton Street and receive an immediate payment of $300,000 against a
total settled amount due him in the business divorce of $560,000 – down from
$586,000 – with the balance of $260,000 to be paid on or before December 1,
2007.)[2]

<u>June 14, 2007</u> (discharge of mortgage is executed, then recorded through
the offices of New York attorney Rinzler on June 27, 2007, removing of record
Mastropole's mortgage on 17 Webster Place.)[3]

---

[1]See Exhibits P-2 and 3, mortgages covering 6 Glenwood Avenue and 17 Webster Place.
Apparently, a single $586,000 obligation was secured by the mortgages.

[2]See Exhibit P-4, which requires the Giudices to personally guarantee the $260,000
balance to be due after payment of the initial $300,000; in fact, the $300,000 was paid and a
guarantee of debt was provided to Mastropole. See Exhibit P-5.

[3]See Exhibit P-6, a document admitted by J. Giudice to have not in fact been executed by
Mastropole nor notarized by the purported notary Gomez; J. Giudice claims that "oral
authorization" from Mastropole permitted him to sign Mastropole's name, a claim which has
been hotly contested by Mastropole and not supported in any manner by extrinsic evidence; J.

<u>NOT FOR PUBLICATION</u>
**LETTER OPINION**

Page 4
January 3, 2011

---

<u>June 27, 2007</u> (refinance of 17 Webster Place paying off $994,565 preexisting mortgage with $1,675,000 loan secured by Dominion Financial Corp. mortgages.)[4]

<u>June, 2007</u> (forms of Mortgage Modification Agreements sent (exact date not ascertained) to Mastropole's counsel acknowledging reduction in the blanket mortgage amount from $586,000 to $260,000 per the Settlement Agreement and its required payment of the $300,000 immediate money.)[5]

<u>December 13, 2007</u> (letter from Saracino to the Giudices and Testa, notifying them of the default with respect to the $260,000 payment due December 1, and demanding cure.)[6]

<u>December 27, 2007</u> (HUD-1 Uniform Settlement form for the refinance of 17 Webster Place with Wachovia, noting payoff of the Dominion mortgage debt

---

Giudice simply asserts that he was authorized, thus placing his credibility and that of Mastropole at the center of this proceeding.

[4]See Exhibits D-2 through 7, documenting the refinance transaction in which New York attorney Rinzler represented the owning-LLC, but sent *certain* documents to the Mizzone Law Firm in New Jersey (of which Mr. Testa is a member), including a discharge of a 2005 mortgage for recording by the New Jersey firm *while the critical discharge of Mastropole's mortgage was recorded through the New York firm.*

[5]See Exhibit D-1.  These document were drafted by attorney Testa, counsel for the Giudices and the owning  LLCs.  Two such agreements were remitted (one for Webster Place and one for Glenwood Avenue).  They were sent to Mastropole's counsel some time in June 2007 and said to have been faxed again in July 2007; in this period the agreements were signed solely by J. Giudice and acknowledged by Testa; Testa testified that, in fact, the Modification Agreements were actually executed fully at some time in *2008 (as to Webster Place, for a mortgage which was discharged of record in June of 2007)*, during the pendency of enforcement litigation brought by Mastropole against the Giudices for breach of the undertaking to pay $260,000 by December 1, 2007.  Testa claims to have been unaware of the discharge until July 3, 2008.

[6]See Exhibit P-5A, which, while referencing default under the June 13, 2007 filed Settlement Agreement, does not specifically refer to a mortgage on 17 Webster Place.

<u>**NOT FOR PUBLICATION**</u>
**LETTER OPINION**

Page 5
January 3, 2011

_____

and other distribution of the refinance funds, with a bottom-line figure of
$258,145.74 returned to the owning-LLC.)[7]

<u>July 3, 2008</u> (date when, as testified to by Testa, he first became aware of
the June 14, 2007 discharge of mortgage; Testa was summoned to an emergency
hearing before Judge McVeigh of the Superior Court of New Jersey, who was
presiding over Mastropole's action to enforce the 2007 settlement.)

<u>October 23, 2009</u> (judgment in the amount of $255,000 in favor of
Mastropole against "Theresa" (sic) Giudice and Giuseppe Giudice.)[8]

\*    \*    \*    \*

The Giudices filed their Chapter 7 bankruptcy petition on October 29, 2009.  Mastropole

filed the immediate adversary proceeding on January 29, 2010.  Between those two dates, the

standard § 341(a) meeting of creditors was held in the Giudices bankruptcy case.[9]  J. Giudice

testified under oath regarding the June 14, 2007 discharge of the Mastropole mortgage as it

applied to 17 Webster Place (Exhibit P-19 at 67:12-23), as follows:

MR. SARACINO: . . . So you acknowledge that there's a balance
on that 560,000 mortgage of 260,000 and you indicate – your
testimony to the trustee is that Mr. Mastropole authorized you to
discharge that mortgage?

_____

[7]See Exhibit D-8.  Introduced as D-9 is a *current* letter, dated November 29, 2010, which
purports to be an accounting for use of the net Wachovia proceeds by the owning-LLC in
satisfaction of approximately $185,000 due a "hard money" lender, who appears to have
obtained mortgages on other properties in which J. Giudice had an interest or control, those
mortgages dated October 31, 2007 and executed for discharge on January 3, 2008.

[8]See Exhibit P-11,  judgment entered by Superior Court of New Jersey, Bergen County
Chancery Division, Hon. Ellen L. Koblitz, enforcing the June 13, 2007 Settlement Agreement.

[9]See Exhibit P-19,  the entire transcript of that December 23, 2009 § 341(a) meeting.

<u>NOT FOR PUBLICATION</u>
**LETTER OPINION**

Page 6
January 3, 2011

_____

MR. Giudice:  Yes.

MR. SARACINO:      Okay.  And – I want to show you a –

MR. Giudice: He was on speaker phone.  All right, so Testa's got the thing as well, he was recording everything so you're going nowhere.  Give it up.

To the same effect, see Exhibit P-19 at 62:1-63:1, including J. Giudice's reference to attorney Testa being a witness to the Mastropole oral authorization ("John Testa, the other attorney was there"),  *id*., at 62:18-19.

*    *    *    *

Plaintiff's witnesses were Mastropole, Testa, Ms. Gomez (the purported notary on the contested mortgage discharge), Ms. Rodriguez (the witness on the same mortgage discharge), and Teresa Giudice.  Defendants called only J. Giudice.

<u>Mastropole's Testimony</u>.

Mastropole clearly, consistently and firmly denied authorizing J. Giudice to execute the critical discharge of mortgage on his behalf.  He stated that he was unaware of the discharge until it came to light in 2008 litigation brought on by his attorney to enforce the June 13, 2007 settlement.  This witness, a licensed real estate broker, was plainly outraged by what he believed was J. Giudice's forging of his name.  In this court's view, Mastropole's overall testimony, angry and aggressive in tone, was uncoached, from his "viscera," ringing with indignation, *and truthful*.        It is noted that Mastropole and J. Giudice were in close proximity to one another at all times relevant, with Mastropole being in his first floor office and J. Giudice being in

Page 7
January 3, 2011

separate offices in that same building on the second floor.[10]  There is no logical explanation by J.

Giudice for *not* obtaining the actual signature of the nearby and readily available Mastropole, *if*

Mastropole had truly agreed to the mortgage discharge in June, 2007.

Mastropole did not implicate Teresa Giudice in any of the actual business affairs between

himself and J. Giudice, other than that she had been a titleholder to certain property (*not* part of

the East Orange multifamily developments).

Gomez Testimony.

Carolina Gomez testified she had worked for J. Giudice, starting in January 2006 while in

high school.  She worked in real estate management for him until March 2007.  She was a notary

public.  Her seal and purported signature acknowledging the "Mastropole" signature appears on

the critical June 14, 2007 discharge of mortgage (Exhibit P-6).

The witness categorically denied acknowledging Mastropole's signature on Exhibit P-6

or affixing her seal to the document.  She was not employed by J. Giudice on that date.[11]  *In fact,*

*J. Giudice admits to having affixed her stamp and seal and signing the former employee's name*

*as if she had acknowledged the Mastropole signature.*

---

[10]In fact, J. Giudice went to Mastropole at some time in December 2007 and gave him a
$5,000 payment (attributed by Mastropole to relate to an earlier vehicle transaction, but credited
against the $260,000 debt by the awarding court in the judgment of October 23, 2009, Exhibit
P-11).

[11]Ms. Gomez said she believed J. Giudice had on occasion signed Mastropole's name to
papers, but she was otherwise nonspecific in this regard.  She had no knowledge of whether such
Giudice acts were authorized by Mastropole.  She disclaimed authorizing J. Giudice to use her
seal or sign her name.

**NOT FOR PUBLICATION**
**LETTER OPINION**

Page 8
January 3, 2011

Ms. Gomez testified that she had called J. Giudice some time after her March 2007

departure from J. Giudice's employ, asking him about her notary stamp and seal which she had

left in her desk.  *J. Giudice told her he had thrown everything out.*

Ms. Gomez testified that by her observation Teresa Giudice was not actively involved in

the Mastropole-Giudice real estate ventures.

Testa Testimony.[12]

Attorney Testa took the witness stand on November 19 and December 14 and 15, 2010.

(Witness Rodriguez testified between segments of the Testa testimony.)  Testa said he

represented the Giudices in the business divorce litigation with Mastropole, which was to have

culminated with the June 13, 2007 Settlement Agreement (Exhibit P-4,  executed by Testa on

behalf of his clients).

Testa's initial testimony about the events surrounding the June 13, 2007 Settlement

Agreement confirmed that he made some changes in a draft provided by Mastropole's counsel,

---

[12]At the outset of trial, *Testa*, through counsel, moved to quash the plaintiff's subpoena
requiring his appearance as a witness, based upon the Giudices' attorney-client privilege.  The
court denied the motion, indicating that the privilege could at trial be asserted on a
question-by-question basis.  It is noted that *two* pending litigations pit Testa and his firm *against*
the Giudices.  First, Mastropole is suing Testa and his firm in state court for their activity
relating to the relevant mortgage discharge and the December 27, 2007 refinance of Webster
Place in which they represented the owning-LLC.  In that case, Testa and his firm have
crossclaimed against the Giudices for contribution and indemnity.  That crossclaim, in turn, has
generated an adversary proceeding in the Giudices' bankruptcy case whereby Testa and his firm
seek to except their state court claim against their former clients from discharge.  See Adv. Pro.
No. 10-1120.  That adversary proceeding has been "stacked" for trial behind this immediate
proceeding, and presumably is trial ready.

Page 9
January 3, 2011

and had it retyped with his firm's "header."  He identified the personal guarantee (Exhibit P-5 required by the settlement), appearing to have been signed by Teresa and J. Giudice and witnessed by Testa.  As to his witnessing the Giudices' signatures, Testa said that J. Giudice signed in his presence, but Teresa's signature was already on the guarantee when her husband brought it to him.  The attorney said he "would not accept that that way."  Testa said he telephoned Teresa.  He questioned her about the document, went through it with her, "and made sure that was, in fact, her signature."[13]

Testa then acknowledged his involvement as closing attorney for the December 27, 2007 refinance of Webster Place with Wachovia on behalf of the owning-LLC.  He further acknowledged receipt of the default and cure letter of December 13, 2007 (Exhibit P-5A), pertaining to the past due December 1 payment of $260,000.  At that point, the asserted attorney-client privilege blocked answers to questions connecting the dots between the June 13, 2007 Settlement Agreement, the Mastropole mortgage on Webster Place and the December 27, 2007 refinance.  Testa was able to affirm that he had reviewed a title report in conjunction with the December 2007 refinance transaction and that no Mastropole mortgage appeared in the chain of title of Webster Place at that time.

At the end of the November 14 trial day, it appeared as though the assertion of the privilege was to stymie the attorney's full expression of important events.  The court advised the

---

[13]Teresa Giudice has denied signing the guarantee and did not recall any such telephone conversation.  J. Giudice has now testified that he "might have" signed Teresa's name to the guarantee.

defense that a negative inference might be drawn from such a use of the privilege.  Defense

counsel and the witness Testa (with counsel) were to discuss his potential testimony and the

defense was to consider a waiver of the privilege on a question-by-question basis.

When trial resumed on December 14, defense counsel indicated that he had just been

provided with documents from Testa's firm's file (presumably in response to a document

demand in the "stacked" adversary proceeding) and that he wanted to use them in the immediate

proceeding.  Counsel asserted the documents were important to establish J. Giudice's defense

(presumably supporting the claim of oral authorization by Mastropole).  *Counsel proffered that

they included material about a June 2007 transaction involving Webster Place (pointing to

Mastropole's purported motivation for annulling the collateral interest he held in Webster

Place).*

At the same time, though Testa had been permitted to respond to a question about his

actions upon receiving Exhibit P-5A, the December 13, 2007 default letter (testifying that he sent

the letter to J. Giudice notwithstanding that the Giudices were also direct recipients), the defense

would not consent to a waiver which would have revealed Testa's actions in and around

December 2007 based upon input from J. Giudice.

The court, in addition to having noted the potential for a negative inference through the

maintaining of the privilege, expressed concern about the use of Testa's file documents by the

defense at trial.  The court warned that a waiver of the privilege could develop.

NOT FOR PUBLICATION
LETTER OPINION

Page 11
January 3, 2011

---

A meaningful portion of Testa's testimony was in response to J. Giudice's twice made sworn statement (at the December 2009 § 341(a) interview) that Testa had witnessed Mastropole's oral authorization to sign his name. The attorney completely refuted – that is, debunked – J. Giudice's sworn statements that Mastropole (on a speaker phone or otherwise) had in Testa's presence or earshot authorized J. Giudice to sign Mastropole's name to the discharge of mortgage (Exhibit P-6).[14] Testa's purported recording of the claimed oral authorization was, of course, denied.[15]

Still loose and seemingly disconnected (because of the privilege) were the actions taken by Testa in June 2007 as counsel in the settlement of J. Giudice-Mastropole differences, the post-default closing of the December 2007 refinance of Webster Place without consideration of Mastropole's claim or mortgage (which, again, did not appear in the preclosing title report), and Testa's statement that he was not aware of and did not see the mortgage discharge until July 3, 2008.

Defense counsel pressed his point about use of Testa's file documents, first discovered by him during trial; plaintiff's counsel objected on the basis of surprise. The documents were copied for the objector to be reviewed overnight.

---

[14]There was no privilege claim (nor could have one been properly put forth) as to Testa's testimony that no such purported authorization by the non-client third-party Mastropole had taken place.

[15]In fact, *J. Giudice's trial testimony did not challenge Testa's refutation.*

Page 12
January 3, 2011

On December 15 defense counsel cross-examined Testa.  The court permitted reference to the "new" documents, including Exhibits D-1 through D-8 from Testa's file.[16]  As previewed, the defense fixed on a *June 2007* refinance transaction for 17 Webster Place, whereby a preexisting $994,565 Astoria Federal mortgage was replaced with $1,675,000 of Dominion mortgages.[17]  Though documents relating to this transaction were in the file of Testa or his firm, that transaction had been serviced for the owning-LLC by or through New York attorney Rinzler (who is said now to be deceased, and may well have actually represented *the lender* in the transaction).  Rinzler had Testa's office (though apparently not Testa) record certain transaction instruments but *not* the discharge of Mastropole's mortgage.  In fact, *Rinzler's office* appears to have sent that for recording (see "record and return" notation on Exhibit P-6).  On the other hand, Rinzler had *Testa's office* record the discharge of the Astoria Federal mortgage as part of the same refinance transaction.  See Exhibits D-4 and 6.  *Inter alia*, the defense's exhibits provided a partial picture of events in the June through December 2007 period, and raised anew a number of puzzling questions.[18]

---

[16]Eventually, all "D" exhibits were admitted into evidence (with only Exhibit D-1, the Modification Agreement draft, and Exhibit D-8, the HUD-1 from the refinance of December 2007, having been the product of Testa or his firm).  Exhibit D-9 was a letter sent during the pendency of *trial* (with mortgage discharges) purported to show use of proceeds from the refinancing by the owning-LLC.

[17]See Exhibits D-2, 7 and 8.

[18]See, e.g., the June 2007 title report for Webster Place, Exhibit D-3.  Listed title exceptions are both the Astoria Federal mortgage lien and that of the Mastropole mortgage.  Compare this with Testa's earlier statements that (i) the December title report showed no

NOT FOR PUBLICATION
LETTER OPINION

Page 13
January 3, 2011

Given (i) the defense's willingness to paint an incomplete picture, in significant part out of the New Jersey firm's file (in an effort to begin to develop a purported motivation for Mastropole to authorize J. Giudice's execution of the mortgage discharge), (ii) the seemingly very selective use of that firm by Rinzler, (iii) the J. Giudice assertion that Testa had witnessed Mastropole's key authorization and Testa's categorical refutation of J. Giudice's claim, and (iv) the testimony that Testa was not aware of the "Mastropole" discharge of mortgage until July 3, 2008, the court concluded that the defense had waived the attorney-client privilege to the extent that it blocked inquiry into Testa's knowledge of events between June 2007 and July 3, 2008. The defense had, with forethought and after notice of the risk, made an *affirmative thrust* into the continuum of Webster Place transactions from and after June 2007; the Testa firm's file *and participation* in such real estate matters was being *asserted* as part of the defense. The privilege, now a device for the defense's selective disclosure, had moved from its permitted posture as a "shield" to become an impermissible "sword."[19]

Besides the waiver resulting from the defense's calculated use of the Testa firm file, it appeared to the court that there was a strong inference that Testa was and had been used as an

---

Mastropole mortgage, and (ii) he did not know of the Mastropole mortgage discharge until July 3, 2008. One implication of the defense's use of the earlier title report *from the New Jersey firm's file* was as a challenge to Testa's stated lack of knowledge of the discharge.

[19]*See generally U.S. v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991); *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1425-26 (3d Cir. 1991); *U.S. v. Amlani*, 169 F.3d 1189, 1194-95 (9th Cir. 1999); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162-63 (9th Cir. 1992); 3 Jack B. Weinstein & Margaret A. Berger, WEINSTEIN'S FEDERAL EVIDENCE, § 503.40-41 (Joseph M. McLaughlin, ed., Matthew Bender, 2d ed. 2005).

NOT FOR PUBLICATION
LETTER OPINION

Page 14
January 3, 2011

---

instrumentality of J. Giudice's fraud *and continuing fraud,* beginning with the apparent forgery

and culminating in the refinance of Webster Place on December 27, 2007.  That fraud, though

not the subject of a final determination, was nonetheless *prima facie* supported by substantial

evidence.  J. Giudice's apparent forgery had set in motion a closing which did not account for

the Mastropole mortgage and which was facilitated by an attorney who was now made to appear

to be aware of the discharge of that mortgage – though he protested otherwise.  *See generally*

*U.S. v. Inigo*, 925 F.2d 641, 656-57 (3d Cir. 1991); *In re Impounded Case (Law Firm)*, 879 F.2d

1211, 1213-14 (3d Cir. 1989); *U.S. v. Jacobs*, 117 F.3d 82, 88-91 (2d Cir. 1997); 3 Jack B.

Weinstein & Margaret A. Berger,  WEINSTEIN'S FEDERAL EVIDENCE, § 503.31 (Joseph M.

McLaughlin, ed., Matthew Bender, 2d ed. 2005), as to the *fraud*-based exception to the

attorney-client privilege.

Once the privilege was denied (over defense counsel's objection) Testa described the

circumstances of the December 2007 refinance.  He stated that J. Giudice came to him in or

around early December and said he had to close a refinance deal in that month.  Testa indicated

that there was insufficient time to arrange the deal.  J. Giudice told Testa the deal was already

being prepared (presumably by Rinzler).  *When Testa asked about Mastropole's involvement, J.*

*Giudice told him that Mastropole had nothing to do with the property that was being*

*refinanced.*[20] Testa accepted this statement, and seems to have missed the connection between

the June 2007 settlement and the property which was the subject of the December transaction.

---

[20]J. Giudice confirmed in his testimony that he in fact made such a statement to Testa.

NOT FOR PUBLICATION
LETTER OPINION

Page 15
January 3, 2011

---

The client, in fact, had interests in a number of properties.  This missed connection is consistent

with Testa's defense of J. Giudice in the 2008 enforcement action, a defense put forth on the

basis of Mastropole's failure (up to some time during the pendency of that action) to execute the

Mortgage Modification Agreement (Exhibit D-1).  Of course, as to Webster Place, there was no

longer a mortgage of record, a circumstance which Testa said he did not know about until July 3,

2008.

When asked whether he believed he had been misled by his client, Testa answered in the

affirmative.  On cross-examination the defense elicited a qualifying response to the effect that

the attorney was only misled if J. Giudice had not been authorized to sign Mastropole's name.

Yet, Testa said that J. Giudice never told him about the discharge of mortgage[21] – a notable

omission by a client who maintained that he had oral authorization to clear the record of

Mastropole's mortgage on Webster Place and who was questioned about Mastropole's

involvement with the property to be refinanced in December 2007.

Rodriguez Testimony.

Ms. Rodriguez was the witness on the discharge of mortgage form here at issue.  She

testified she had worked for J. Giudice for a number of years in real estate management.  She had

also worked for Mastropole.  In 2007 she was working for J. Giudice, but did not recall

witnessing the discharge of mortgage, Exhibit P-6.  She confirmed that Ms. Gomez was not

---

[21]J. Giudice's trial testimony was silent on this point.

NOT FOR PUBLICATION
LETTER OPINION

Page 16
January 3, 2011

working there in June 2007.  Ms. Rodriguez provided no testimony that, by her observation,

Mastropole had on any occasion authorized J. Giudice to sign Mastropole's name to documents.

Teresa Giudice Testimony.

T. Giudice confirmed that she did not work in her husband's real estate business or with

Mastropole-J. Giudice business ventures.  "I was not involved in their business," as she put it.

Recently she became aware that her name was "on" certain real estate.

She testified that she never met Testa.  She did not recall the guarantee (Exhibit P-5), nor

any telephone conversation with Testa about the guarantee.  She was vague throughout most of

her testimony, and particularly so in this regard.

The singular area of T. Giudice's testimony which was firm and emphatic was as to her

purported signature on the personal guarantee.  She said she did not sign the document.[22]

Defense Motions to Dismiss.

The plaintiff's case ended and the defense moved for dismissal.  Causes based upon

11 U.S.C. § 523(a)(2)(B) and (4) were dismissed as to both defendants.[23]  The court denied the

motion as to § 523(a)(2)(A) (fraud) and § 523(a)(4) (willful and malicious injury to property) as

to J. Giudice.  However, the court dismissed the case against Teresa Giudice in its entirely based

upon the total absence of evidence connecting her – other than as a spouse – to her husband's

---

[22]When J. Giudice testified, he said he "might have" signed Teresa's name.

[23]These grounds were essentially conceded by plaintiff's counsel (though the
§ 523(a)(2)(B) ground, a plainly inapposite assertion since no financial statement was at issue,
was more not responded to than affirmatively conceded).

Page 17
January 3, 2011

---

real estate business affairs.  Plaintiff, in essence, conceded the dismissal of Teresa from the case

after a short discussion of the persisting precedent regarding imputed liability of a business

partner.[24]

     <u>J. Giudice Testimony</u>.

     The defense presented only J. Giudice as a witness.  After describing his longstanding

relationship with Mastropole, the witness was directed to the May-June 2007 period and the

business aspects of Webster Place.  He emphasized that the property was in need of a full

renovation requiring substantial funding.  The testimony was that Mastropole was aware of the

need.  Moreover, Mastropole was a bit happier at this time, having received the $300,000

immediate money commitment from the June settlement.

     J. Giudice considered the refinancing of Webster Place to be necessary to fund its

renovation.  He arranged through Rinzler a Dominion mortgage to replace the earlier Astoria

Federal mortgage.  He had "a lot going" with Rinzler at that time (May-June 2007).  The

$586,000 Mastropole mortgage of record (which he said should have been in the amount of

$260,000 after June 2007 events) was an impediment to the Dominion transaction.

     The testimony was that without the Dominion deal, Mastropole would not get his money

(presumably the $260,000), because the property would be lost.  "Nobody would have got

---

[24]*Compare and contrast In re M.M. Winkler & Assocs.*, 239 F.3d 746 (5th Cir. 2001) with
*In re Tsurukawa*, 258 B.R. 192 (9th Cir. B.A.P. 2001).

Page 18
January 3, 2011

anything, the building would have just sat there."[25]  Mastropole was said to have known this.

The clear implication was that Mastropole signed off to advance his own cause in getting paid

after the renovation and out of a rehabilitated Webster Place.

J. Giudice said he told Mastropole that there had to be a discharge of his mortgage on

Webster Place; Mastropole was supposed to have responded "do what you got to do" and agreed

to the mortgage discharge.  The court notes that the witness's body language, tempo in

responding to direct questions, and voice in answering changed noticeably as he said this; his

testimony was thoroughly unconvincing in this regard.  No specifics were put on the record as to

how many such discussions of the plight of Webster Place took place, where and precisely when

this happened or any other facts which would lend credibility to the witness's mantra-like

testimony that "Mastropole knew all about it."

J. Giudice was asked about his § 341(a) interview and specifically about his statements

that Testa had heard and recorded Mastropole's oral authorization to sign the mortgage

discharge.  The response was of someone caught by his own fabrication.  There was no challenge

to Testa's sworn disavowal.  The best that J. Giudice could say was that he was very busy at that

---

[25]J. Giudice said flatly that Mastropole "would never get his money" without the
rehabilitation of Webster Place; yet the settlement agreement which was nearly contemporaneous
with this supposed alerting of Mastropole, did not so condition payment, nor was the personal
guarantee conditioned on renovating Webster Place.  By this testimony, if believed, the
defendant would have alerted Mastropole that he was running a business risk with Webster Place
(if it should "fail"), while ownership *and any "upside"* remained with Giudice (through an
LLC).  The testimony is inconsistent with the concept of the business divorce in which
Mastropole was to get a fixed sum, secured by Webster Place and Glenwood Avenue and
guaranteed by both Giudices.

**NOT FOR PUBLICATION**
**LETTER OPINION**

Page 19
January 3, 2011

time (June 2007), that he was inaccurate in his responses at the interview, that he was in a lot of

offices (Testa's several times), and that his recollection is or was unclear.

As to the discharge form, Exhibit P-6, the witness said that Rinzler prepared it for the

Dominion transaction.  J. Giudice, acknowledging his signature as "Mastropole" on the form

("he gave me authority"), asserted in defense that his unauthorized forging of Mastropole's

signature at this time would make no sense.  His point was that "we're in litigation," and that a

forgery would have quickly been discovered by Mastropole.

As an additional element of defense, J. Giudice said he and Mastropole signed each

other's name as a regular part of their business; however, no specifics of this purported practice

or documented examples were discussed or offered.  Even if this element of Giudice's testimony

were taken to be true (and one were to bolster it with Gomez's statement that she had seen

Giudice sign Mastropole's name, but not *vice versa*), it lends little support to the Giudice claim

of signature authorization in June 2007.  The fact that there might have been such a practice

*when the parties were in business together*,[26] does not serve as support for or authorization of a

post-divorce signature on an instrument which severely undercut the tenor of the settlement

agreement.

---

[26]Gomez started working for Giudice while in high school in 2006 and left his employ in March 2007.  She does not articulate – nor was she asked – what she saw Giudice sign as "Mastropole" i.e., whether it was correspondence, instruments, documents, etc.  She made clear that she knew nothing of authorization, and she never indicated that she notarized a Giudice signature in the form of "Mastropole."

NOT FOR PUBLICATION
LETTER OPINION

Page 20
January 3, 2011

---

The witness's use of the Gomez notary stamp and his forging of her name was similarly addressed by him: "I used [it] all the time. . . ."[27]  Then – gratuitously offered but telltale in its exposure of both J. Giudice's lack of credibility and his "say anything, do anything" attitude – he dismissed this forgery by saying he "could have went across the street for $5" and gotten a real notarization!  Of course, he could not have gotten an honest notary (for $5 or otherwise) to take *his* signature as *Mastropole's*.  J. Giudice was both thoroughly unconvincing as a witness, and unbounded as a prevaricator in spinning a tale about the events of June 2007 concerning the Mastropole mortgage discharge.

---

[27]J. Giudice's stark testimony on this subject is as follows (12/15/10 Tr. 162:11-15):

> Well she had ordered the stamp while she was working for me, which, you know, I used all the time in front of her, stamped it, I didn't ask her questions, I would just stamp and do it, you know. Business like usual.  You know something that we just did everyday.

This same witness, with some degree of *inconsistency* but the same "what's the problem" demeanor, said with regard to his use of Ms. Gomez's notary seal (12/15/10 Tr. 177:22-178:1):

> It was in my office.  It was used for my office.  Anything that had to do with my office, that's what we used it for.
> . . . .
> I would do it in front of her, I wouldn't do it in front of her, *it didn't matter.* [Emphasis added.]

*Contrast* C. Gomez's straightforward testimony that she never authorized anyone, J. Giudice in particular, to sign her name as notary.  (11/19/10 Tr. 235:22-236:5.)

Page 21
January 3, 2011

---

The witness acknowledged that he told Testa that the property to be refinanced in
December 2007 had nothing to do with Mastropole.  He acknowledged having made this
statement to Testa, notwithstanding Giudice's own cover story that Mastropole had authorized
the mortgage discharge because otherwise Mastropole would have gotten nothing out of the
unrehabilitated property on Webster Place.

Finally, on direct, the defense introduced Exhibit D-9, a *current letter* (with attachments)
detailing payment said to be out of the December refinance of Webster Place by the owning-LLC
to a purported "hard money" lender.  The attachments were discharges of mortgages on a
number of other Giudice properties (not the East Orange properties), reflecting October 2007
loans.  The purpose of the use of this exhibit and related testimony was to show that a substantial
part of the proceeds from the December closing (approximately $258,000 going "free" to the
owning-LLC), was in fact remitted by the LLC (in the amount of approximately $185,000) to
this lender. What it showed, however, was Giudice's directing elsewhere those funds which
could have been used to pay off a large part of the Mastropole debt (and essentially all of that
debt if the entire net proceeds from the December refinance were directed to Mastropole).
Indeed, J. Giudice made sure that the December refinance "had nothing to do with Mastropole."

On cross-examination regarding T. Giudice's signature on the guarantee, J. Giudice said
"I might have signed that . . . I don't know."  He also said he did not know if Testa had called
Teresa about the guarantee.  Giudice also confirmed that he didn't tell Testa about the

NOT FOR PUBLICATION
LETTER OPINION

Page 22
January 3, 2011

Mastropole discharge of mortgage (and he had previously confirmed that he told Testa that the property to be refinanced had nothing to do with the former business partner).

When cross-examined about the purported necessity to sign on Mastropole's behalf, J. Giudice again referred to the way they had done business.  He said he had gone down to Mastropole's office for the signature.  Mastropole was not there but called in saying he was tied up.  At this point, Giudice says Mastropole gave him authorization to sign.

Ultimately, J. Giudice confirmed that both the Webster Place and Glenwood Avenue properties were in foreclosure.[28]

Summations.

The defense closing argument centered on what it characterized as the virtual absurdity of a Giudice forgery while litigation was ongoing, on the need to renovate the Webster Place property, and on the failure of the default and cure letter of December 13, 2007 to make specific reference to a mortgage.  The point was also proffered that, if J. Giudice had intended to defraud his business partner, he would not have paid the "immediate" money ($300,000).  In the end, so claimed the defense, both Giudice and Mastropole "cut corners" in their business affairs and were less than meticulous about such things as documents and signatures.

---

[28]Mastropole was called for short rebuttal testimony.  He emphasized that he never let anyone sign documents on his behalf.  He also stressed his reliance on the East Orange mortgages.  He noted his lack of awareness until just before July 2008 of the discharge of mortgage and similarly that he did not know of the December 2007 refinance until much after the fact, and disclaimed knowing of the need to renovate Webster Place.

<u>NOT FOR PUBLICATION</u>
**LETTER OPINION**

Page 23
January 3, 2011

The plaintiff pressed the principal argument of Giudice's lack of credibility with a list of points underscoring the blatancy of his forgery.

\*    \*    \*    \*

<u>Conclusion</u>.

*Giudice signed the discharge of Mastropole's mortgage without his knowledge or authorization.*

J. Giudice was not being truthful when he averred that Mastropole had authorized the signing of his name on Exhibit P-6.[29]  The signing of Mastropole's name was a forgery, made with business motives (i.e., to garner funds through refinancing transactions), exhibiting willfulness and malice toward a former friend and current adversary.  The extraordinary web of lies and misrepresentations woven by Giudice to implement and cover his misconduct reflects on his approach to business matters, and suggests his disregard for legal restraints which would bind others.

This defendant's lack of credibility is established by the following:

> ●Giudice's twice told sworn story that attorney Testa heard (and recorded) the phantom Mastropole authorization – a tale later debunked by Testa and then "explained" by confusion and lack of recollection testimony by this defendant at trial;

---

[29]This conclusion is readily reached and evident even without any consideration of that part of Testa's testimony which followed the stripping of the attorney-client privilege from the defense (and which would otherwise have been subject to that privilege).  The balance of the evidence is *overwhelming* in establishing the falsity of Giudice's claim of being an authorized signatory.

<u>NOT FOR PUBLICATION</u>
<u>LETTER OPINION</u>

Page 24
January 3, 2011

---

●His unabashed wrongful use of Ms. Gomez's notary seal and the signing of her name as notary to the discharge of Mastropole's mortgage – later rationalized at trial as being Giudice's alleged regular practice, and with the inexplicable comparison to paying $5 to a "notary across the street";

●Giudice's lie to Ms. Gomez when she inquired about her seal by telephone, only to be told that he "threw everything out";

●This defendant's use of his young employee, Rodriguez, to blithely execute as "witness" an important document (the Mastropole mortgage discharge) when in fact she witnessed no such signing by Mastropole;

●His thoroughly *cagey* statement that he "might" have signed Teresa's name on the personal guarantee of debt to Mastropole;[30]

●His farfetched discharge cover story – the need for funds to renovate the Webster Place property as the only route, as he explained it to Mastropole, by which Mastropole could be paid his $260,000 – juxtaposed with Giudice's failure to pay Mastropole out of either the June 2007 or the December 2007 refinance of that property;[31]

●The fact that the defendant's office was proximate to Mastropole's, putting in serious question why Mastropole's actual

---

[30]This was in apparent conjunction with presenting the guarantee form to attorney Testa as if Teresa had signed.

[31]Of course, there is the tie-in here to Giudice's misleading statement to Testa that Mastropole had nothing to do with the property to be refinanced in December 2007. (When asked what he meant by this statement, Giudice responded "[w]ell when he [Mastropole] signed, you know, when he allowed me to sign the discharge, I mean, it had nothing to do with him, *it's not like I was lying.*" (Emphasis added.) In addition, Giudice never told Testa about the discharge, even after Testa (as Giudice admits) asked whether the property to be refinanced involved Mastropole.

NOT FOR PUBLICATION
LETTER OPINION

Page 25
January 3, 2011

signature was not obtained (unless, of course, as was the case, Mastropole would not have signed);

●Giudice's heavy involvement with New York attorney Rinzler and that attorney's selective use of Testa's firm to record certain June 2007 refinance instruments, including a discharge of the preexisting Astoria Federal mortgage, but *not* the key Mastropole mortgage discharge (which was marked "record and return" to Rinzler);

●The observable characteristics of Giudice, in particular as he testified to the authorization by Mastropole (that is, change in tone and tempo of speech and body language);

●Giudice's reversion to vagueness or generalities in response to questions which seemed to trap him or where it was otherwise convenient to fill a factual gap in his fabrications ("I might have," "I can't recall," That was "business as usual," "He [Mastropole] knew all about it"); and

●The absence of any document or non-Giudice testimony supporting *factually* the "authorization" premise invented by J. Giudice.[32]

Conversely, Mastropole's testimony and overall position were credible. His settlement with Giudice was filed June 13, 2007. It would make little business sense for him to undercut collateral which was part of the credit arrangement referenced in that settlement by releasing his

---

[32]The defense offered documents of the June 2007 refinance to establish Mastropole's *motivation* to give up his collateral; however, nothing extrinsic in evidence supports the actuality of Mastropole's authorization outside of the thoroughly unbelievable story told by Giudice. In fact, even his generalities (i.e., the manner of doing business with free and easy document signing in the past) which could have been documented, remained essentially unsupported (save for some passing nonspecific reference by Gomez that she had seen Giudice sign Mastropole's name on occasion, though she knew nothing of *authorization*).

**NOT FOR PUBLICATION**
**LETTER OPINION**

Page 26
January 3, 2011

---

mortgage on Webster Place the very next day.  And, the notion that such a release was a function of his *oral* authorization is likewise incredible.

The defense's arguments hypothesizing Mastropole's motivation to release the lien on Webster Place (Giudice's out-of-thin-air contention that it was necessary to "save" the property so that Mastropole could be paid), the "that's the way we did business" justification for the forging of Mastropole's name, and emphasis on the absence of a specific reference to the Webster Place mortgage in the plaintiff's defaulted cure letter of December 13, 2007, are make-weight at best.  Similarly, unconvincing are Giudice's contentions (i) that if he had intended to defraud or injure Mastropole, he would not have paid the $300,000 immediate money in June 2007, and (ii) that engaging in a forgery while he was in litigation with Mastropole would have been foolhardy and quickly discovered.  Even if these arguments were to have some merit if a truth-telling, law-respecting party were defending, that is not the present case.  Giudice is that party defendant who brazenly "notarized" (by forgery) his own forgery of his business associate's signature, and otherwise fabricated stories (e.g., the Testa "witnessing" that was not), all with reckless abandon.  It is not difficult to see Giudice rationalizing that payment of $300,000 was "enough" for Mastropole, and if Mastropole were eventually to discover the forgery, Giudice would come up with something (such as the oral authorization ploy) when pressed.  The worst fate that would befall him would be that he be made to pay what he owed through the settlement agreement.

<u>NOT FOR PUBLICATION</u>
**LETTER OPINION**

Page 27
January 3, 2011

---

*Exception to Discharge per 11 U.S.C.§ 523(a)(2)(A).*

The Giudice forgery under the circumstances established in this proceeding leads to the clear conclusion that J. Giudice defrauded Mastropole.  That conclusion justifies excepting Mastropole's claim from any bankruptcy discharge of J. Giudice which might eventuate.

The defense has argued that since the *debt* to Mastropole predated the forgery and subsequent refinance transactions for Webster Place, and since *that debt* was not fraudulently induced, Giudice's conduct does not fit within the § 523(a)(2)(A) exception to discharge.  This argument incorrectly narrows this provision.[33]  While it is true that the basic business divorce obligation due Mastropole (initially $586,000) was not fraudulently incurred, the events surrounding the settlement agreement were distinctly different.  That agreement was to end Giudice-initiated litigation which centered on continued financial connections between the parties.  It was to be a global resolution of their differences, and in fact *reduced* the $586,000 preexisting debt to Mastropole (secured by the blanket mortgages on three East Orange properties) to $560,000.  The settlement, embodied in Exhibit P-4, was explicit as to the pay-down ($300,000 immediately), and ultimate payoff (by December 1, 2007).  It also was clear that the $260,000 post-June balance was to be secured by both the Webster Place and

---

[33] 11 U.S.C. § 523(a)(2)(A) provides:
    (a)  A discharge under section 727 . . . of this title does not discharge
    an individual debtor from any debt–
       (2) for money, property, services, or an extension, renewal, or
    refinancing of credit, to the extent obtained, by–
          (A) false pretenses, a false representation, or actual fraud. . . .

<u>**NOT FOR PUBLICATION**</u>
**LETTER OPINION**

Page 28
January 3, 2011

---

Glenwood Avenue properties, and was to be personally guaranteed by the Giudices.  That

agreement was, at a minimum,[34] "an extension, renewal or refinance" of the preexisting debt due

Mastropole.  Imbedded in the settlement was the representation that Mastropole's collateral

(except for the Clinton Street property specifically cited for release from Mastropole's lien and

out of which the $300,000 was to be paid) would remain intact until the $260,000 final payment

---

[34]The record reflects only Mastropole's $586,000 mortgage as a function of earlier
negotiated business separation terms.  Each of the East Orange properties was owned by an LLC.
The Giudices' personal guarantee appears to be their first individual undertaking – i.e., personal
debt – to Mastropole.  Hence, *that debt* appears to have been incurred through the June 2007
settlement, a settlement which, as set forth above, was the product of both fraud at outset in June
and as a continuing matter.

NOT FOR PUBLICATION
**LETTER OPINION**

Page 29
January 3, 2011

---

was made.[35]  "The payment of the $260,000 to Joseph Mastropole shall satisfy both the blanket

mortgage and the personal guarante [sic]. . . ."

---

[35]Relevant provisions of the agreement (entitled "Stipulation of Settlement," Exhibit P-4) are as follows:

> 3.  The Defendant shall provide to Plaintiffs a Discharge of Mortgage for property commonly known as 168-170 S. Clinton Street, East Orange, New Jersey. . . .
>
> 4.  When the preceding term is accomplished, the Plaintiffs shall then proceed to close on a re-finance of the property commonly known as 168-170 S. Clinton Street, East Orange, New Jersey. From the proceeds of that re-finance, Plaintiffs shall pay to Defendant Joseph Mastropole the sum of Three Hundred Thousand Dollars ($300,000.00). . . .
>
> 5.  Plaintiffs shall execute a mortgage modification agreement in the amount of Two Hundred and Sixty Thousand Dollars ($260,000.00) for the blanket mortgage covering the two parcels of real property commonly known as 17 Webster Avenue, East Orange, New Jersey and 6 Glenwood Avenue, East Orange, New Jersey.
>
> 6.  Plaintiffs shall also sign a personal guaranty to Joseph Mastropole for the amount of Two Hundred and Sixty Thousand Dollars ($260,000.00) as additional security for the mortgage described in paragraph 5.
>
> 7.  The Plaintiffs shall then proceed to close on a re-finance of either of the properties commonly known as 17 Webster Avenue, East Orange, New Jersey and 6 Glenwood Avenue, East Orange, New Jersey. From the proceeds of that re-finance, Plaintiffs shall pay to Defendant Joseph Mastropole the sum of Two Hundred and Sixty Thousand Dollars ($260,000.00).  The closing on the re-finance and the payment to Joseph Mastropole shall take place on or before December 1, 2007.  The payment of the $260,000 to Joseph Mastropole shall satisfy both the blanket mortgage and the personal guarante [sic] described and referenced herein.

NOT FOR PUBLICATION
LETTER OPINION

Page 30
January 3, 2011

---

No change was to be made in these terms except by written agreement of the parties.[36]

Hence, the maintaining of Mastropole's secured position until payment was not only a static

representation fundamental to Exhibit P-4, but was a continuing representation.  The next day

after Exhibit P-4 was filed with the Superior Court of New Jersey, Giudice forged Mastropole's

signature and thus initiated a chain of events through two refinance transactions (either of which

should have generated the $260,000 due Mastropole) by which Mastropole was defrauded.

This court finds that J. Giudice knowingly deceived Mastropole at the outset of the recast

deal in June 2007, and knowingly deceived him when he dishonored the continuing

representation that the stated collateral would remain without modification until payment.

Section 523(a)(2)(A) requires proofs of *common law* fraud in all of its five elements.[37]

---

[36]Exhibit P-4, ¶ 12 provides:

> 12.  This Stipulation of Settlement sets forth the entire
> Settlement Agreement and understanding between the parties. . . .
> There are no other agreements, covenants, arrangements, warranties,
> reprsentations, [sic] or the like concerning the subject matter of this
> Stipulation of Settlement, either written or oral.  No modification of
> the Settlement Agreement embodied by this Stipulation of Settlement
> shall be effective unless set forth in an amended stipulation of
> settlement  filed with the Court and signed by all parties hereto or
> their counsel.

[37]The elements of common law fraud are:  (1) that the defendant made a material
misrepresentation of a present or past fact; (2) that the defendant made the  misrepresentation
with knowledge of its falsity; (3) that the defendant made the misrepresentation with the
intention that the plaintiff rely on the misrepresentation; (4) that the plaintiff justifiably relied on
the misrepresentation; (5) that the plaintiff suffered damages as a result.  *In re Reynolds*, 193
B.R. 195, 200 (D.N.J. 1996)*; In re deBaggis*, 247 B.R. 383, 389 (Bankr. D.N.J. 1999).  *See
generally Grogan v. Garner*, 498 U.S. 279, 287-88 and 291 (1991), which requires that each of

Page 31
January 3, 2011

Giudice's representation to Mastropole, as described above, was that the Webster Place

mortgage would remain undisturbed until full payment of the balance due.  As part of the

settlement agreement, it is clear that Giudice intended to have Mastropole rely on this

representation.  This representation (*both* as originally made and as the obligation continued)

was essentially immediately dishonored by virtue of the forgery, leading this court to conclude

that Giudice had *misrepresented* what was to transpire, *knew* when he initially made the

representation *and* as he continued making that representation that it was *false*, and *intended to*

*deceive* Mastropole at outset of the settlement *and* as events put in motion by the settlement

unfolded.  Mastropole, believing that he had the protection and benefit of his mortgage, was

*justified* in *relying* on Giudice's representation that the mortgage would remain of record as to

Webster Place until the debt was satisfied.  Giudice's act of forgery was an unforeseen event and

one which would not have been anticipated by business people similarly situated to Mastropole.

That event denied Mastropole two opportunities for payment: once when Webster Place was

refinanced in June 2007, and then when it was refinanced again on December 27, 2007.

Therefore, Giudice's forgery and overall fraud through misrepresentation were the proximate

cause of Mastropole's loss.  Mastropole's claim embodied in J. Giudice's judgment debt of

---

these elements must be proven by the plaintiff by a preponderance of the evidence.  *Sub judice*,
these elements are well established by evidence readily satisfying that standard.

<u>NOT FOR PUBLICATION</u>
**LETTER OPINION**

Page 32
January 3, 2011

---

$255,000 plus interest (Exhibit P-11) thus fully qualifies for the § 523(a)(2)(A) exception to

discharge.[38]

    *Exception to Discharge per 11 U.S.C. § 523(a)(6).*

    Section 523(a)(6) is that exception to the bankruptcy discharge which is based upon

*willful* and *malicious* injury to person or property.[39]  The Supreme Court case of *Kawaauhau v.*

*Geiger*, 523 U.S. 57 (1998), details requisites for the exception and, overall, excludes from the

exception debts arising from recklessly or negligently inflicted injuries.  However, when the

*injury* which gives rise to the debt is willful and malicious, discharge is to be denied.  *Geiger*,

elaborating on the statutory term "willful," said the following (*id*. at 61):

> The word "willful" in (a)(6) modifies the word "injury," indicating
> that nondischargeability takes a deliberate or intentional *injury,* not
> merely a deliberate or intentional *act* that leads to injury. Had
> Congress meant to exempt debts resulting from unintentionally
> inflicted injuries, it might have described instead "willful acts that
> cause injury." Or, Congress might have selected an additional
> word or words, *i.e.,* "reckless" or "negligent," to modify "injury."
> Moreover, as the Eighth Circuit [the court below] observed, the
> (a)(6) formulation triggers in the lawyer's mind the category
> "intentional torts," as distinguished from negligent or reckless

---

[38]Both Webster Place and Glenwood Avenue are now in foreclosure; yet the June 2007
refinance put in place *$1,675,000* of mortgages in paying off an Astoria Federal mortgage of
$994,565, and the December 2007 transaction showed a "bottom line" of more than $258,000
netting to the owning-LLC.   See Exhibits D-2, 7 and 8.

[39]11 U.S.C. § 523(a)(6) provides:
    (a) A discharge under section 727 . . . of this title does not
discharge an individual debtor from any debt–
        (6)    for willful and malicious injury by the debtor to
            another entity or to the property of another entity. . . .

**NOT FOR PUBLICATION**
**LETTER OPINION**

Page 33
January 3, 2011

_____

> torts. Intentional torts generally require that the actor intend "the
> *consequences* of an act," not simply "the act" itself. Restatement
> (Second) of Torts § 8A, Comment *a,* p. 15 (1964) (emphasis
> added).

The malice element of § 523(a)(6) requires a wrongful act inflicted without just cause or

excuse. *See Geiger*, 523 U.S. at 63. *See also, In re Stelluti*, 94 F.3d 84, 87-88 (2d Cir. 1996). A

showing of personal hatred, spite or ill-will is not necessary to establish malice. *Ibid. See also*

*Printy v. Dean Witter Reynolds, Inc.*, 110 F.3d 853, 859 (1st Cir. 1997).

In fact, *Geiger* cites and quotes historic precedent which bears on the matter here at issue,

as follows:

> In *McIntyre v. Kavanaugh*, 242 U.S. 138, 37 S.Ct. 38, 61 L.Ed.
> 205 (1916), a broker "deprive[d] another of his property forever by
> deliberately disposing of it without semblance of authority." Id., at
> 141, 37 S.Ct., at 39. The Court held that this act constituted an
> intentional injury to property of another, bringing it within the
> discharge exception.

523 U.S. at 63. And, while *Geiger* makes clear that not all torts deemed to be "conversions"

qualify as being willful and malicious (given that negligent or reckless acts *can* establish the

tort), the matter at bar involves the clearest of conversions which support exception to discharge.

Giudice's multiple acts of forgery and deceit readily establish both conversion and wrongful

conduct intentionally inflicted to injure Mastropole's property, all done without any just cause or

excuse.

Giudice's deception over at least a six-month period in 2007 parlayed an unauthorized

*twice* forged discharge of mortgage into two "clear title" refinance transactions in which he was

<u>**NOT FOR PUBLICATION**</u>
**LETTER OPINION**

Page 34
January 3, 2011

---

the sole beneficiary.  Mastropole's property, i.e., his mortgage of record on Webster Place, was

negated and the real estate which was to be his collateral was thoroughly drained of its equity by

Giudice.

      The debt due Mastropole by J. Giudice embodied in Mastropole's prepetition judgment

(Exhibit P-11) is excepted from discharge on this second ground, § 523(a)(6).

*   *   *   *

      The court has entered its implementing order and includes a copy herewith.

      Very truly yours,

      */s/ Morris Stern*

      Morris Stern
      United States Bankruptcy Judge

MS/pc
Enclosure
cc:   Michael A. Artis, Esq.
      Office of the United States Trustee

      Paul L. Croce, Esq.
      Kalison, McBride, Jackson & Robertson, PC